# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMOND GARY MILLER, | Case No. 1:12-cv-2063-SKO |
| Plaintiff, | **ORDER AFFIRMING ALJ'S DECISION** |
| v. | (Docket No. 1) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

**INTRODUCTION**

Plaintiff Armond Gary Miller ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") benefits pursuant to Title XVI of the Social Security Act. 42 U.S.C. § 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 8, 9.)

**BACKGROUND**

Plaintiff was born in August 1962, and has a 10th grade education. He was involved in an industrial accident in 1987 and was crushed by a hydraulic press. As a result, he suffered an injury to his left femoral artery. (AR 278.) The left femoral artery injury was repaired at the time of the accident by means of an aortofemoral bypass. (AR 278.) The bypass ruptured in June 2011, and Plaintiff required emergency surgery to repair and resect his iliac artery. (AR 275, 229-300.)

Plaintiff also suffered a left-knee injury when he was involved in a bike versus automobile accident in 2001. (AR 257.) Plaintiff alleges the knee injury has worsened over time, causing him to become disabled as of June 14, 2008. Plaintiff filed an application for SSI on November 25, 2009, alleging disability due to torn ligaments in his left knee, shoulder pain, asthma, high blood pressure, and a hernia. (AR 186.)

**A.     Relevant Medical Evidence**

On December 17, 2009, Plaintiff was examined by Sarupinder Bhangoo, M.D. (AR 233-36.) Plaintiff reported that he had suffered a knee injury in 2001 as a result of a car accident. He tore the ligaments of his left knee and required a knee replacement. (AR 233.) Plaintiff rated the pain in his left knee as 10 out of 10, with 10 being the most pain. (AR 233.) He also indicated that his left knee frequently swells. (AR 233.) Plaintiff reported being able to "get around" and worked until 2008, at which time he had to quit because he was laid off. (AR 233.) He indicated he currently has a "hard time" bending, lifting, or doing any kind of physical work. (AR 233.) Plaintiff also reported a history of left-femoral artery bypass. (AR 233.)

Plaintiff complained of left-leg fatigue and pain after walking. (AR 234.) Dr. Bhangoo noted that Plaintiff came into the examination room without difficulty, was able to climb on and off the examination table without difficulty, but he favored his left knee and had a slight limp. (AR 234.) On examination, he indicated Plaintiff had a small umbilical hernia, a light effusion of the left knee with full range of motion, and slight tenderness in his left knee. (AR 235.) Dr. Bhangoo opined Plaintiff had an effusion of the left knee, which he tended to favor; he did not exhibit problems with bending, but he did have problems with crouching. (AR 236.) Based on his examination, Dr. Bhangoo opined Plaintiff should be able to stand and/or walk for six hours in an

2

eight-hour day; sit for six hours during an eight-hour workday; and he would be able to bend or stoop frequently, although he would be limited to only occasional crouching based on his knee problems. (AR 236.) He also opined Plaintiff would be able to perform work at the medium exertional level, but with a limited ability to crouch. (AR 236.)

On December 31, 2009, state agency physician G. Bugg, M.D., reviewed Plaintiff's medical records and affirmed Dr. Bhangoo's opinion. (AR 237-43.) He opined Plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; stand and/or walk about six hours in an eight-hour day; sit for a total of about six hours in an eight-hour day; and could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; kneel; crouch; or crawl. (AR 238-39.)

On January 4, 2010, Plaintiff was seen at Antelope Valley Community Clinic for complaints related to asthma, knee pain, and a dry throat. (AR 257.) Plaintiff reported left-knee pain and that he experienced popping and swelling in that knee. (AR 257.) He stated he had been unable to take medication due to financial problems; he was provided with medication refills, and was warned about the signs of stroke and the benefits of smoking cessation. (AR 257.) Plaintiff returned for a follow-up visit on January 25, 2010, and it was noted his blood pressure was improving and his gait was normal; his medications were refilled at that time. (AR 256.)

On February 10, 2010, state agency physician J. Mitchell, M.D., reviewed Plaintiff's medical records. (AR 250-51.) He agreed and affirmed Dr. Bugg's assessment of Plaintiff's condition, finding that there was no change in his functional limitations since December 2009. (AR 250.)

In April 2010, Plaintiff was seen at the Los Angeles County USC Medical Center where he reported left-knee pain. (AR 268.) An x-ray of his left knee showed mild narrowing of the medial femorotibial compartment, and adjacent osteophyte formation. There was a "loose body identified within the medial compartment, measuring 1.3 cm x 7 mm in size." (AR 270.) The attending physician, Bhakta Ramesh, M.D., who had ordered the x-ray, reviewed it and prescribed disalcid tablets for the pain.[2] Plaintiff was also referred to an orthopedist. (AR 267.) No activity

---

[2] Disalcid is a nonsteroidal anti-inflammatory drug that is used for treating fever, pain, and inflammation in the boyd.

1  limitations were noted. (AR 267.)

2       On June 28, 2011, Plaintiff began experiencing left-lower abdominal pain that worsened to
3  the point that he went to the emergency department at Tehachapi Valley Hospital. Plaintiff was
4  diagnosed with iliac artery aneurysm and was transferred from Tehachapi to Bakersfield Memorial
5  Hospital. (AR 278.) Upon admittance, he reported no weakness or pain down his left leg. (AR
6  278.) He underwent a repair and resection of the aneurysm, and he was discharged on June 30,
7  2011.

8  **B.    Administrative Proceedings**

9       The Commissioner denied Plaintiff's application initially and again on reconsideration;
10 consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 70-
11 74, 79-84, 85-87.) On August 2, 2011, the ALJ held a hearing. (AR 30-56.) Plaintiff testified,
12 through the assistance of counsel, and a vocational expert provided testimony. (AR 30-56.)

13        **1.    Plaintiff's Hearing Testimony**

14      Plaintiff was born in 1962 and has a 10th grade education. (AR 35.) In 1987 he was
15 involved in a work accident where he was caught in a press machine, which broke his back and
16 pressed the femoral artery on his left side. (AR 44.) Approximately two months after the accident
17 he was seen by a doctor who informed him he had a crushed artery which caused his leg to fatigue
18 when he walked.

19      He worked for a flooring company from 1994 to approximately 2000, after which he
20 worked as a floor installer. In 2008 he worked as a telemarketer for a water purifier company.
21 (AR 35.) Plaintiff has problems with his left knee, shoulder problems, asthma, high blood
22 pressure, and a hernia. (AR 36.)

23      Plaintiff became disabled in June 2008 when the artery in his left leg began to "clog up"
24 and he was not getting proper blood supply to the limb. (AR 34.) The leg became fatigued, and
25 he believed this was because it was not getting a sufficient supply of blood. (AR 34.) In 2001, he
26 was involved in a bicycle versus car accident which "totally ripped all the ligaments out of [his]
27 left knee and ripped the patella in half so there's nothing holding [his] knee together." (AR 34-35.)

28

His shoulder problem is due to a torn rotary cuff. Whenever he tries to lift his arm "up high" or reach down for something, "it's like somebody's got a knife in there twisting it." (AR 39.) He has asthma, but he has been unable to quit smoking. (AR 39.)

The swelling in his knee started getting worse about five years before the hearing, and it worsens each year. The knee "goes out" at times and it causes him to fall; for example, it will go out if he is getting into a truck. (AR 42.) He is not currently taking any medication except his high blood pressure medication because that is all he can afford. (AR 42.) In April 2010, an x-ray of his knee was taken, and he was referred to an orthopedic surgeon. (AR 41.) When he appeared for his appointment with the orthopedic surgeon, he was asked for a copy of a magnetic resonance imaging scan ("MRI"), which Plaintiff did not have. He was told that he had to have an MRI before he could be evaluated by the orthopedic surgeon. (AR 41.)

In 2011, Plaintiff began to have abdominal pain which worsened until he was admitted to the emergency room. (AR 46.) At the time of the femoral artery repair, which was the cause of his abdominal pain, they also repaired his hernia. (AR 46.) After the artery was repaired again in June 2011, the blood circulation was increased, and his leg no longer becomes fatigued.

Regarding his back, if he tries to sit for any amount of time it starts to ache. (AR 46.) If he performs activities or stands for a long period of time it starts hurting. (AR 46.) His back aches, and wakes him in the middle of the night "all the time." (AR 46.) His left knee aches constantly; when it "pops out," it swells and he cannot walk for up to five days. (AR 47.) Also, when his knee gives out, it causes him to fall. (AR 47.) He had fallen two times in the three months prior to the hearing; both of those incidents occurred when he was getting out of a truck. (AR 47.) He cannot afford pain medication, but he does take aspirin, Tylenol, and Motrin over-the-counter. He takes Motrin almost every day because that seems to help his back, and Aleve helps with his knee pain. (AR 48.)

As to his ability to walk, before the artery in his leg was repaired, he could only walk half a block before he would need to stop and rest. Now he can walk much better, but his knee bothers him when he walks. If he is "up on it a lot" when he shops, or if he does a "bunch of stuff in a day," he will have to take breaks and "get off of it" for a period because it "gets sore." (AR 48.)

Sitting does not bother his knee "too much," but his back bothers him when he has to sit for an extended time. He is not supposed to lift anything over 15 pounds because of the knee surgery. The more weight he picks up, the more his knee hurts. (AR 49.) He could not go back to his flooring job because his knee swells up too much and could not withstand that type of work. (AR 50.) As for another type of job that would not require any heavy lifting, his ability to perform the work would depend on how much sitting and standing he had to do. (AR 49.)

### 2. VE Hearing Testimony

The VE testified that Plaintiff's past work as a floor installer is classified by the Dictionary of Occupational Titles ("DOT") as a skilled position requiring a medium[3] level of exertion. (AR 50.) His past work as a telemarketer is classified by the DOT as semi-skilled, sedentary[4] work. (AR 51.) The ALJ asked the VE to consider a hypothetical individual of the same age and education and with the same work history as Plaintiff who could perform medium exertional work, but who was limited to only occasional stooping, crawling or bending and who must avoid fumes, dust, and gas. (AR 51.) The VE testified that such a hypothetical person could perform Plaintiff's past work as a telemarketer. (AR 51.)

The ALJ posed a second hypothetical, asking the VE to consider a person of the same age, and with the same work history and education as Plaintiff, who was limited to light-level exertional work; could only occasionally stoop, crawl, and bend; and would need to avoid fumes, dust, and gases. (AR 51.) The VE testified that such a person could perform Plaintiff's past relevant work as a telemarketer.

The ALJ posed a third hypothetical, asking the VE to consider a person with the same limitations as posed in the second hypothetical, but who could only perform sedentary-level exertional work. (AR 51.) The VE testified that such a person could perform Plaintiff's past relevant work as a telemarketer. (AR 51.)

---

[3] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 416.967(c).

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 416.967(a).

6

The ALJ posed a final hypothetical, asking the VE to consider a person with the same limitations in the prior hypothetical, but who must perform less than two-hours of standing or walking and up to only six hours of sitting. (AR 52.) The VE testified that such a person could perform Plaintiff's past work as a telemarketer.

Plaintiff's counsel also posed a hypothetical, asking the VE to assume the limitations and restrictions posed by the ALJ in the third hypothetical, and questioned whether adding a sit/stand option would affect whether the person could perform the work of a telemarketer. (AR 53.) The VE testified that, if the person had the ability to take notes or record information while standing, the sit/stand option would not create additional limitation. If a person did not have that ability, then the sit/stand option would be impractical for the telemarketer position. (AR 53.) The ability to stand while taking notes or recording information would be an accommodation provided by the employer, and it is not typically offered. (AR 53.) The VE noted there are some sedentary jobs that will offer a sit/stand option, but overall sedentary unskilled positions require manipulative tasks and require a worker to be seated at his station to perform the required tasks. (AR 54.)

Plaintiff's counsel also asked the VE whether a hypothetical person's absence twice a month would be acceptable for competitive work environments, and the VE testified it would not. (AR 54.)

**3.    ALJ's Decision**

On August 19, 2011, the ALJ issued a decision finding Plaintiff not disabled. (AR 19-25.) Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the date the application was filed; (2) has the following severe impairments or combination of impairments: asthma, degenerative joint left knee, and a hernia; (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A or B; (4) retains the residual functional capacity to perform light work, limited to occasional stooping, crawling, and bending and must avoid exposure to fumes, dust, and gases; (5) is capable of performing his past relevant work as a telemarketer; and (6) has not been under a disability since November 25, 2009, the date his application was filed. (AR 19-25.)

7

## C. Plaintiff's Appeal of the ALJ Decision

Plaintiff sought review of the ALJ's decision before the Appeals Council. (AR 7.) On October 22, 2012, the Appeals Council denied review. (AR 1-4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

On December 19, 2012, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff contends the ALJ erred by giving weight to the state agency physicians' opinions because there was subsequent medical evidence the state agency physicians were unable to review in making their assessments of Plaintiff's functional limitations. Further, the ALJ erred by failing to obtain a more recent medical opinion as to how subsequent x-rays and a surgery impact Plaintiff's limitations. (Doc. 16.)

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. See *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

**A.     The Parties' Arguments**

Plaintiff contends the ALJ improperly relied on the consultative examiner and the state agency non-examining physicians in concluding he retained the ability to perform his past relevant work and was therefore not disabled.  Specifically, Plaintiff contends Dr. Bhangoo's examination and Drs. Bugg and Mitchell's review of his records were all performed prior to his April 2010 x-ray that revealed a loose body in his knee as well as prior to his June 2011 left iliac artery surgery. Thus, these physicians were not able to adequately ascertain whether Plaintiff's objective knee impairment affected his ability to sit or stand or whether the artery bypass limited his ability to walk or created a need to frequently alternate positions.  Although the ALJ could have remedied this error by either calling a medical expert to testify or by sending Plaintiff to another consultative examination, none of these actions were taken.  Plaintiff asserts this was error.

The Commissioner argues that, although Plaintiff refers to the April 2010 left-knee x-ray, he fails to provide any evidence or explain how the x-ray findings affect his functional abilities or how the evidence undercuts any of the physicians' opinions.  No functional limitations were recommended at the time of the x-ray by the attending physician; rather the doctor prescribed medication only for the pain.  Plaintiff does not refer to other treatment for his knee after this time, and there is no indication Plaintiff sought additional treatment for his knee.  Both the objective evidence and Plaintiff's complaints are "minimal."

Regarding Plaintiff's 2011 surgery, the record indicates his condition improved after surgery, not that it worsened.  Although Plaintiff contends he may require a sit-stand work accommodation, this is only speculation and there is no physician support for such a limitation. To the extent Plaintiff alleged a need to sit and stand intermittently because of his lower back condition, there is little evidence of any recent back treatment or complaints of back pain.  The medical opinions indicate Plaintiff could perform a range of medium work in 2010, and neither the subsequent x-ray findings in April 2010 nor the June 2011 surgery to repair the femoral artery indicate a worsening of Plaintiff's functional abilities thereby creating an ambiguity in the medical evidence.

Plaintiff filed a reply to the Commissioner's opposition asserting that the ALJ erred by failing to address the possible impact of the left knee x-ray and the left iliac rupture on the opinions of Drs. Bhangoo, Bugg, and Mitchell.  Plaintiff argues the subsequent x-ray and iliac artery repair surgery notes create an ambiguity that suggests his condition has changed since the opinions of Drs. Bhangoo, Bugg, and Mitchell were rendered.  Although the ALJ discussed the 2010 x-ray findings, he failed to note the radiologist's finding of a loose body in the lateral compartment of Plaintiff's left knee.  Further, the ALJ is not competent to interpret the x-ray, and cannot resolve the question whether the x-ray would affect the physicians' opinions as to Plaintiff's functional abilities.

**B.    Subsequent Medical Evidence Does Not Create an Ambiguity Triggering the ALJ's Duty to Develop the Record Further**

Plaintiff argues the April 2010 x-ray and the June 2011 emergency surgery undermine the earlier opinions of the state-agency physicians and render the record ambiguous such that the ALJ was required to obtain further medical evidence.

Where the record is ambiguous, the ALJ's duty to supplement the record is triggered. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).  The ALJ must take reasonable steps to ensure that the issues and questions raised by the medical evidence are addressed so that the disability determination may be fairly made on a sufficient evidentiary record, whether favorable or unfavorable to the claimant.  *See Tidwell v. Apfel*, 161 F.3d 699, 602 (9th Cir. 1999); *see also* 20 C.F.R. § 416.927(c)(3).  When it is necessary to enable the ALJ to resolve a disability issue, the duty to develop the record may require consulting a medical expert or ordering a consultative examination.  *See* 20 C.F.R. § 416.919a.  The government is not required to bear the expense of an examination for every claimant, *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001), but a consultative examination is normally required where there is an indication of a change in a claimant's condition that is likely to affect the claimant's ability to work, and the current severity of the claimant's impairment is not established.  *See* 20 C.F.R. § 416.919a(b)(4).

### 1. The 2010 X-Ray Findings Do Not Create an Ambiguity Triggering the ALJ's Duty to Develop the Record

Regarding the April 2010 x-ray of Plaintiff's left knee, the findings were reviewed by attending physician Dr. Ramesh, who saw Plaintiff when he was admitted to the emergency room on complaints of knee pain. (AR 267.) Upon review of the x-ray, Dr. Ramesh referred Plaintiff to an orthopedist, but prescribed only a pain reliever and did not note any additional restrictions on activities, despite that there was a place to list such limitations on the form. (AR 267.) While the x-ray indicated a "loose body" in Plaintiff's left knee, the degenerative joint disease in that knee was noted only to be mild. (AR 267.) In light of the fact that Dr. Ramesh did not prescribe or note any additional limitations upon review of this x-ray, the ALJ was entitled to infer that Plaintiff did not have additional limitations beyond those imposed by the physicians in 2010. *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (stating that the ALJ "is entitled to draw inferences 'logically flowing from the evidence'").

Plaintiff cites *Salazar v. Astrue*, 10-cv-1686-GGH, 2012 WL 761715 (E.D. Cal. Mar. 6, 2012) for the proposition that where subsequent medical findings indicate a worsening of a claimant's condition, the need for further medical evidence is triggered. In *Salazar*, the ALJ found Plaintiff had only mild limitation in his back and he was capable of performing light work. The ALJ relied on two examining physicians and one non-examining physician who reviewed an x-ray that showed an impression of mild degenerative disk disease. *Id.* at *3. Subsequently, the claimant underwent an MRI which showed that he had degenerative disc and facet disease of his lower spine and a broad-base disc bulge causing severe canal stenosis. *Id.* Under these circumstances, the Court found the ALJ erred in failing to order a consultative examination or even discuss the MRI report and analyze its possible impact on the physicians' opinions. *Id.*

This case is distinguishable from *Salazar*. In *Salazar*, the MRI results stood in stark contrast to the prior x-ray results and tended to clearly indicate a worsening condition. Here, there are no prior x-ray findings with which to compare the 2010 x-ray results. Thus, while the April 2010 x-ray showed a "loose body" in Plaintiff's knee, it cannot be established this finding somehow represented a change in Plaintiff's condition. Four months earlier, in December 2009,

12

Dr. Bhangoo considered Plaintiff's statements that his knee ligaments were torn and he needed a knee replacement. Dr. Bhangoo also had an opportunity to examine Plaintiff's knee, considered Plaintiff's slight limp and that he favored of his left side, and still imposed only a medium exertional limitation after assessing Plaintiff's range of motion and slight tenderness in his knee. (AR 235.) Additionally, the degenerative disc disease evidenced on the 2010 x-ray was found to be only mild by the radiologist, which tends to corroborate Dr. Bhangoo's assessment rather than create an ambiguity in the record. The attending physician reviewing the April 2010 x-ray did not impose any additional physical restrictions in his treatment notes despite the fact that there was a place in the record to do so. (*See* AR 267 (noting that recommended restrictions on activities and recommended follow-up were listed above).) Instead, Dr. Ramesh prescribed only a pain reliever and referred Plaintiff to an orthopedist. While Plaintiff argues Dr. Bhangoo or the non-examining physicians may have changed their assessment of Plaintiff's limitations had they been able to review the x-ray results, the x-ray results coupled with the attending physician's lack of noted restrictions or limitations render Plaintiff's assertion mere speculation.

Additionally, the ALJ in *Salazar* did not consider the MRI findings or discuss the impact of the findings. Here, the ALJ discussed the 2010 x-ray findings, noted that degenerative joint disease was only mild, and that the attending physician prescribed only pain medication. Although the ALJ did not expressly note the "loose body" in Plaintiff's knee, the attending physician who reviewed this finding explicitly noted it but did not indicate it was the basis for any limitations or restrictions on activity.

Plaintiff also argues the ALJ was not competent to interpret the x-ray findings to implicitly conclude no further medical evidence was needed. However, the ALJ did not independently interpret the x-ray findings. Rather, the ALJ considered both the radiologist's interpretation of the x-ray and the attending physician's notes and review of the x-ray findings. This fact distinguishes this case from *Whitendale v. Astrue*, No. 1:10-cv-01561-SKO, 2012 WL 652646, * 10 (E.D. Cal. Feb. 28, 2012), which Plaintiff cites for the proposition that an ALJ is not competent to interpret x-ray results and fashion an RFC therefrom. In *Whitendale*, an examining physician opined the claimant, who had multiple impairments including obesity, could only be expected to stand and

walk for four hours. *Id.* at *4. The ALJ considered x-ray findings showing only mild degenerative arthritis, rejected the examining physician's opinion regarding the claimant's standing and walking limitation, and determined the claimant instead could be expected to stand and walk for up to six hours. *Id.* at *10. On appeal, the court determined that in the absence of other medical evidence, the x-ray did not speak for itself with respect to the number of hours the claimant could stand and walk. *Id.* The x-ray findings themselves were also less probative of the claimant's standing and walking abilities because the claimant had multiple impairments that could have affected her ability to stand or walk that would not have been reflected on the x-ray. *Id.* The court noted these additional conditions could have been the basis for the examining physician's standing and walking limitation. *Id.* Thus, the court determined the ALJ erred in rejecting the examining physician's opinion solely on the basis of the x-ray findings. *Id.*

Here, because the attending physician reviewed the April 2010 x-ray findings and did not impose further functional limitations, the ALJ was entitled to infer that Plaintiff's knee limitation was not more severe or worsened since his compensation examination in December 2009. *Macri*, 93 F.3d at 544. Coupled with the attending physician's examination notes, the April 2010 x-ray findings do not create an ambiguity in the record or trigger the ALJ's duty to develop further medical evidence. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2011) (ALJ's duty to further develop the record is only triggered where there is ambiguous evidence or the record is inadequate to allow for the proper evaluation of the evidence).

**2. The June 2011 Iliac Artery Repair Surgery Did Not Create an Ambiguity in the Medical Evidence**

Plaintiff argues his June 2011 surgery creates an ambiguity in the record that required the ALJ to develop more medical evidence.

At the hearing, Plaintiff testified his leg fatigue was improved after the surgery, and there is no objective medical evidence that his condition worsened post surgery. (AR 46, 48.) The surgery records do not show that Plaintiff was advised not to stand or sit for extended periods or to keep his leg elevated, nor did Plaintiff testify he was instructed to do so. If this were a necessary limitation arising as a result of the surgery, Plaintiff's treating physician would have indicated this

in the discharge notes, but no such limitation was noted. Instead, at the time of discharge, Plaintiff was prescribed medication, and it was recommended that he follow-up with his physician in one to two weeks. (AR 275.) There is no record establishing Plaintiff followed-up or had any complication following the surgery. In fact, he appeared at the hearing only one month after the surgery. In sum, the June 2011 left iliac surgery treatment notes do not indicate Plaintiff's condition or physical limitations worsened as a result of the surgery such that it triggered the ALJ's duty to more fully develop the record or order a consultative examination.

To the extent Plaintiff contends the 2011 surgery records show his artery impairment "limited his ability to walk and likely required him to frequently alternate positions," this argument is not corroborated by Plaintiff's hearing testimony or any medical records. Although Plaintiff testified his left leg was easily fatigued upon walking or climbing stairs *prior* to surgery (AR 48), he did not report leg fatigue when he was examined for knee pain in either January 2010 (AR 257) or April 2010 (AR 268). And while Plaintiff testified he became disabled in June 2008 because the artery in his left leg started "clogging up" (AR 34), he reported to Dr. Bhangoo that he stopped working in 2008 because he was laid off. (AR 233.)[5] Additionally, in none of Plaintiff's disability reports did he identify left-leg fatigue as a disabling condition. (AR 207 (November 2009 disability report indicating his conditions included left knee problems, shoulder problems, asthma, high blood pressure, and a hernia); AR 220 (February 2010 disability report where Plaintiff indicated he had no new physical or mental limitation since the last report).) Further, while Plaintiff testified he experienced fatigue in his leg prior to surgery which precluded him from walking distances, his testimony about the extent of his limitations was discredited. The June 2011 surgery report provides no evidence as to the extent of Plaintiff's leg condition or limitations prior to surgery. In sum, the surgery report did not create an ambiguity with respect to Plaintiff's abilities prior to the surgery.

---

[5] Even crediting the full extent Plaintiff's testimony regarding his leg fatigue, which the ALJ did not, it does not establish Plaintiff was disabled or create an ambiguity in the evidence. The ALJ found Plaintiff could perform his past work as a telephone solicitor. This position requires only brief walking or standing. DICOT 299.357-014 (characterizing job as "sedentary work" and noting that sedentary work "involves sitting most of the time, but may involve walking or standing for brief periods of time"). Thus, any leg fatigue suffered prior to surgery that precluded Plaintiff from walking distances of length does not establish Plaintiff is unable to perform his past relevant work.

Post-surgery, Plaintiff testified he could walk and his left leg is "as good as [his] right [leg] now." (AR 48.) The ALJ also noted Plaintiff testified at the hearing his "main problem" precluding him from his prior work installing flooring is his knee. (AR 22, 50.) While Plaintiff maintains his iliac artery rupture and the subsequent surgery in 2011 created an ambiguity with respect to his limitations that the ALJ failed to consider, Plaintiff points to no evidence showing that his condition worsened or his limitations were greater as a result of the surgery. Rather, Plaintiff's own testimony establishes that he recovered well and he suffered no more fatigue in his left leg.

Finally, although Plaintiff argues the subsequent medical evidence tends to show he was required to alternate between a sitting and standing position, Plaintiff did not testify that he needed to alternate positions as a result of the surgery. Plaintiff stated he needed to alternate between sitting and standing because of his back pain (AR 49), yet he offered no medical evidence establishing a back impairment or evidence of treatment for back pain. 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings . . . ").

In sum, the Court concludes the April 2010 x-ray findings and the June 2011 surgery did not render the record ambiguous or trigger the ALJ's duty to develop further medical evidence.

### 3. The ALJ Was Entitled to Rely on the 2010 Examining and Non-Examining Physicians' Opinions

As discussed above, the April 2010 x-ray findings and the June 2011 surgery treatment notes do not create an ambiguity with respect to the medical evidence and Plaintiff's degree of limitation. The subsequent records do not render the prior state agency opinions less probative or undercut their value as substantial evidence upon which the ALJ was entitled to rely.[6] Finally, had Plaintiff believed these reports were outdated and no longer accurate, he could have asked the ALJ to consider ordering a further consultative examination. He did not do so.

---

[6] To the extent the ALJ impermissibly rejected the "medium" exertional limitation opined by Drs. Bhangoo, Bugg, and Mitchell and imposed a "light" exertional imitation in the RFC, such error is harmless and Plaintiff has not presented any argument that the exertional limitation in the RFC was prejudicial.

16

C. **ALJ Did Not Err In Failing to Consider a Closed Period of Disability Following Plaintiff's June 2011 Surgery**

Framing the argument in only one sentence, Plaintiff contends "[t]he recuperation period [from the June 2011 surgery] alone should entitle appellant to a closed period of benefits." (Doc. 16, 7:6-7.)

To obtain a closed period of disability, the evidence must show that (1) the claimant could not engage in substantial gainful activity for a continuous period of 12 months; (2) the disability ceased by the time of adjudication; and (3) the claimant met all the other eligibility requirements for benefits. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a); *Rosales v. Colvin*, 2013 WL 1410387, at *4 (D. Ariz. Apr. 8, 2013) ("The ALJ is required to consider a closed period of disability if evidence in the record supports a finding that a person is disabled for a period of not less than twelve months.").

Although Plaintiff states the recuperation period from his iliac artery surgery should entitle him to a closed period of benefits, Plaintiff was discharged from the hospital after two days, and there is no evidence that his recuperation lasted for at least 12 months. Plaintiff also reported at the hearing held approximately one month after the surgery, that his left leg was now as good as his right leg. Notably, Plaintiff's representative argued at the August 2011 hearing that Plaintiff was disabled *until* his surgery, but presented no argument or evidence that Plaintiff was disabled post surgery due to the need to recuperate. (AR 55.)[7] Plaintiff did not apply for a closed period of disability, and has not produced sufficient evidence to show he was unable to work due to a recovery period lasting at least 12 months. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995) ("The claimant bears the burden of establishing a prima facie case of disability."). It was not error for the ALJ not to consider Plaintiff's recovery period for a closed period of disability.

---

[7] Plaintiff argues that his incisions from the surgery "required lengthy healing time precluding all work." (Doc. 16, 3:17-18.) Plaintiff offers no evidence to support this assertion. Plaintiff also contends that if an exert had reviewed the surgery records, it is like that it would have been recommended that Plaintiff have a "sit-stand" option putting him at less than sedentary work, but again Plaintiff offers no evidence to support this assertion.

17

**CONCLUSION**

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: __**July 27, 2014**__                    __**/s/ Sheila K. Oberto**__
                                                                  UNITED STATES MAGISTRATE JUDGE